Don Jackson v. The Library Store Don Jackson v. The Library Store I'd like to begin by addressing a comment made by the circuit court in its order, paragraph 3 of the order. It says the reduction in the number of directors was a permissible activity by the majority of shareholders. Ordinarily I would agree with that statement, but that's not what happened in this case. It is unrebutted that the reason for Cynthia Springer being removed from the board of directors of this family owned business was because she had filed, in their words, a lawsuit against the company. And that was said by the company attorney at a December 2007 board meeting, when they voted to reduce the number of directors from five to four. In fact, the only thing that Cynthia Springer had done at that point in time was to file a charge with the equal opportunity office in Chicago, EEOC, alleging a violation of the Americans with Disabilities Act. And to retaliate against her for that reason is, of course, an illegal act. By the time that that happened, if I can go back in time just a moment, this is a family owned business, mother, father, two brothers, and Cynthia Springer, their daughter. The daughter and two brothers had purchased a business that was ancillary to the library store. It was called Trecon at the time. And they purchased it from their father and their mother. They took a loan, and once the loan was paid off, the two brothers and the daughter began to take draws from that company. All three of them serviced the company, even though they were working full time for the library store as well. And when the father, Don Gunther, found out about that, he threatened to sue them if they didn't return their draws to Trecon. Now understand that Don Gunther had no interest in this business at that time, but he not only threatened to sue them, but he also made veiled threats that he would remove them from their positions with the library store. At that time, Cynthia Springer was the vice president of operations. She was in charge of pretty much the entire business. All the executives of the business reported to her. Well, while that was brewing, Cynthia then became ill with cancer. And early in 2007, she and her husband traveled quite a bit to Texas for treatments. And so she missed some work. There was no question about that. But when she returned from Texas, she requested to go back to work as vice president of operations, and Don Gunther refused to allow her to do that. And she made many requests, even through her mother, Marilyn, one of the other stockholders, to go back to work. But she was not allowed to go back to work. And then in July of 2007, she filed her charge with the EEOC, that she was being retaliated against because she had cancer. She was also required to, before she could come back to work, bring back a doctor's excuse. Had never been required of any other person in the business prior to that. She was offered the opportunity to come back to work, but at a beginning position in the bid department, very first activity in the business. And she wanted to go back to her regular job. She also requested some accommodations to allow her, because of her cancer, when she got tired, to be able to work from her home on her computer, which she was doing while she was in Texas. And that was also denied. Well, then, as I say, in July, she filed her charge with the EEOC. And then in December, they voted to reduce the number of directors from five to four. And the reason given during the board meeting by their attorney was that they could not afford to have anybody on the board of directors who was filing a lawsuit against the company. Again, at the risk of being redundant, the only lawsuit that was filed was the charge with the EEOC. And, of course, it's unlawful to retaliate against somebody under federal law and the state law, because he or she has filed a discrimination case. Now, that is one of the indicia of a violation of 805 IOS 512.56. That is that the company engages in illegal conduct. And that was illegal conduct at the time. As a side issue, I advise the court that she did file, eventually, a lawsuit, but it was after she was removed from the board of directors. In that case, an ancillary proceeding was, in fact, settled. But that did not in any way, and she filed it under the Americans with Disabilities Act, but that did not in any way take away from the fact that the reason for her discharge was an illegal reason under the statute. Now, in my judgment, that should have gotten us to a point of discussing damages in this case under the law. We had met our burden of proving that this was a company that didn't have its shares of stock on any major stock exchange. And I think we also met our burden of showing that they had engaged in an illegal act. But even before that, before the actual lawsuit was filed, many things happened to Cynthia. During the course of trying to get back to work, when she filed the charge, I think it was July 7th of 2007, within 10 days of filing the charge, she received a letter from her father, Don Gunther, that she was being fired from the company. That, too, is an illegal act. You can't retaliate against a person because he or she has, under either the state law or the federal law, filed a charge with an agency like EEOC. But other things happened to her. She lost the ability to get into the company, either through computers or otherwise. In other words, she was locked out completely from the company at that point in time. There came a time later on when Don and Marilyn decided to give up the business, and so they sold their stock to the remaining two brothers, but refused to sell Cynthia a proportional share based on her share ownership of their stock. And they admitted during the trial of this matter that the reason was that she sued them. And, again, the suit was a civil rights lawsuit. They admitted to that, and it's undisputed as to the reason why she was released from the board of directors. Many other things happened to her during that period of time. As I said, she was denied an opportunity to buy into their shares of stock. The company purchased two other companies during this period of time. Notwithstanding the fact that she was still a shareholder, they refused to allow her to buy into those new companies, notwithstanding the fact that they operated out of the library store where she had an interest in the business. They used library store assets to support these two other companies, but she was locked out of any participation in either the revenue of those companies, but she did obviously have to contribute to their expenses by virtue of her ownership in the company. As I say, the judge also ruled, or the circuit court did, that her discharge eventually, in July of 2007, was lawful. And I understand the philosophy that employees serve at will, at the will of the company. I understand that. But that's not what happened in this case. She was discharged for the specific reason that she had filed that charge with EEOC, and later on was dismissed from the board of directors for that reason. That's an unlawful reason as well. Illegality is one of those criteria used in determining whether or not our statute, 805 statute, is in fact or has been violated. You know, the court, in its opinion, talked about the fact that illegality or fraud are the only ways to show oppression, but that's not true. Under the statute, a series of conduct practiced against a minority stockholder can also be called oppression under the statute. So oppression isn't just illegality or fraud, although we do have illegality in this case. It can also be the series of things that happen to an individual. And in our brief, we outline a number of things that happened to Cynthia as a result of the illegal conduct being shut out of the corporation by the mother, the father, and the two brothers after she filed her charge with EEOC. There is one mistake that we made in our brief, and I wanted to bring it to your attention at page 20 just for the record. We made the statement, if I can get to that in my brief here, that the plaintiff, and I'm on page 20, points A and B, the plaintiff received 59% of the reported company profits, and I want to talk about that in just a moment, prior to the action taken by the defendants. Actually, what we meant to say was the shareholders received 59% of the reported company profits prior to the action taken, and we did cover it correctly in our reply brief. But in our major brief, our initial brief, we mentioned it as the plaintiffs, but it was really the shareholders, and, of course, point B in that section is correct. Let me talk about that just for a moment. Counsel has two minutes. Thank you. One of the things the court did was, during the course of the trial, in proven damages, we had an expert who testified both as to excessive profits earned by the two brothers once they had all the shares in the company, except for those owned by the estate. He also wanted to testify to excessive rents that they paid. When they got all the stock, they, in essence, sold the most important assets to themselves and then increased the rent and paid themselves an object of excessive salaries as well. Our expert was not allowed to testify to that, notwithstanding the fact that we think that the statute 705, I think it is, adopted from the federal rules, clearly allows an expert to testify to documents by other experts informing an opinion. The documents themselves may not be admissible because of hearsay, but certainly the expert is allowed under the rules to testify, and the court, of course, excluded that testimony. We think that's important in terms of being able to prove damages that suffered by the estate of Cynthia Springer as a result of that ruling. So the bottom line is we're asking the court to reverse the decision or at least send it back for a hearing on damages because we think that we've proven what we're supposed to under the statute to get to that point of damages. Do you have any questions? Thank you very much. Thank you. Okay, Justice Holder, if you mind, let me remind both of you, as I mentioned to both of you, that the empty chair here is for Justice McDade. She was not able to make the court call today, but she will be involved in our decision-making. She will hear the tapes of the argument and will be fully involved with us. All right. Thank you. May it please the Court, I'm Pat McGrath, attorney for the appellee in the library store, Incorporated, Don Gunter, Marilyn Gunter, Stephen Gunter, and Gregory Gunter. The appellee requests that the order of the trial court be affirmed on appeal. It's the appellee's position that the plaintiff chose to bring its action under Section 83 of the applicable statute that the plaintiff failed to meet its burden under the action it chose to file. It's the position of the appellee that the trial court correctly ruled on the evidentiary objection on Neal Gerber's expert testimony and further the position of the appellee that the trial court appropriately weighed the credibility and the weight to give particular evidence offered when making its determination. The first issue raised in the filings is similar to the issue raised in arguments made by Mr. Jackson, though the argument today focuses more on the illegality element than I believe the written filings did leading up to today. The written filings and the presentation of the appellant focuses the court's attention to Sections 83 and 84 of Section 12.56 of the Business Corporations Act. Section 83 talks about fraud, illegality, or oppression. Section 84 talks about waste or mismanagement of the corporation's assets. The appellee's position is that the plaintiff chose to raise its claim under Section 83. While there are a few references to Section 84, those are fleeting and not as central as the references to Section 83. The key document that I would call the court's attention to when defining the scope of the issue raised by the plaintiff for the court to decide is the plaintiff's statement of the case. In a plaintiff's statement of the case, there's a recitation of the issues for the court to decide at trial. And that recitation of the issues done by the plaintiff uses only wording from Section 83 of the statute talking about fraud, illegality, or oppression. And further in the argument section, the statement of the case, references made only to Section 83 of the statute. So it's the appellee's position that the plaintiff chose to raise issues only under Section 83 of the statute and not under Section 84. Okay, why don't you put your edification and repeat what 83 means? 83 is fraud, illegality, or oppression. Okay, so we've got oppression. Correct. The whole argument on that first issue is about, right, whether there is evidence of oppression. Yes, Your Honor. And the facts alleged were removal from the Board of Directors, or what's your understanding? There are several individual facts alleged to support a claim of oppression, one of which was removal of Cynthia Springer from the Board of Directors. I would, just in my own verbiage, distinguish maybe removal from her falling off the board. The shareholders acted permissibly and exercised the rights reserved to them under statute to reduce the size of the board from five to four directors. And then when an election happened, Cynthia wasn't elected. So she wasn't removed during the term of an existing office, but rather her office ended and she was not selected to a new term on the reconstituted Board of Directors. The reference that counsel made in his argument to statements regarding her being removed for filing an action against the company, I believe, and I don't have the exact quote in front of me, but spoke more to the challenge of disharmony in the operation of the Board of Directors and the fact that when individuals aren't getting along, it makes the operation of the Board of Directors quite challenging. I believe that is a reasonable conclusion, a reasonable reason for the business's action that does not equate to oppression. Other factors alleged... So are you saying illegality is the sine qua non of oppression? Illegality is not absolutely required in order to establish oppression. I believe illegality is not absolutely necessary. Illegality can establish or fraud or oppression, and there isn't in statute a definition of what oppression means as used in Section 8.3. Some of the case law talks about an arbitrary, heavy-handed course of conduct, and so in explaining the actions of the Board of Directors, I would contend they were neither illegal nor arbitrary and unreasonably heavy-handed. And is that the decision point for the trial judge? I believe that the trial judge, speaking to that particular issue and its weight and its disposition claim, I believe the trial court's view is comparable to what I presented to the court today, that it was neither illegal nor arbitrary and unreasonably heavy-handed. The interesting thing about the trial court's order is, while it references wording from the statute, it also references wording from the Jackie case. And, excuse me, I'm not certain it comes from the Jackie case, but wording that even a plaintiff advocated for in some of the plaintiff's trial advocacy, which is that standard of arbitrary, heavy-handed course of conduct. So I don't believe the trial court expressed an opinion that illegality or fraud must be necessary. When it wrote its opinion, it used the phrase, but I don't interpret the wording of the trial court to limit its analysis to finding it had to be illegal or fraudulent. To the court's further question, some other factors which were alleged to be evidentiary of oppression were the lack of inclusion of Cynthia Springer in certain business opportunities. Those business opportunities came to other shareholders personally. Opportunities like buying the business real estate from a library store or investing in this company called PetMeds. I don't believe that shareholders owe a duty to other shareholders to include them in unrelated or even quasi-related business ventures. So the lack of inviting Cynthia to buy into PetMeds, for example, which was a separately owned business, I don't believe raises to the level of establishing oppression. Similarly, the employment issue, and the employment issue wasn't... So if I understand basically, we have a board of directors over a company that's buying another company? Is that correct? It's my understanding, Your Honor, that the library store did not buy PetMeds, but rather Steve Gunter and other members of the board of directors of the library store purchased PetMeds, but it was not owned by the library store. There's some contention that library store financially supported PetMeds, but I don't believe that was established with any degree of certainty or probativeness at trial. I don't believe that was proven in any meaningful way at trial. And who was on the board of the library at that time? The board of library store at the time of that acquisition, I believe that would have been the four ventures who I represent. I believe that would have been Don, Marilyn... My mom, dad, and two brothers. Yes, Your Honor. Other conduct which was alleged to be probative of oppression was changing the locks on the business, and the trial could conclude that really properly that changing the locks on the business wasn't proven to have interfered with Cynthia Springer's access to business records. The statute reserves for her right to obtain access. Being a shareholder in a business doesn't necessarily entitle you to keys to the front door. There are many closely held businesses where individuals are investors, and they're not given keys and permitted to come and go as they wish from the building, so I don't believe that equated to lack of access to her important business records. The employment issue was litigated separately and was settled and resolved between the parties. I don't believe Illinois law provides any guaranteed right to employment or any tether between being a shareholder in a corporation and being employed there, so whether Cynthia was or was not employed does not equate to unfair treatment of her as a shareholder. It's perfectly permissible for an individual to be a shareholder in a corporation and choose not to employ them. Cynthia also declined or didn't respond to an opportunity that was afforded her to be employed by the corporation. The plaintiff's contention is that the trial factor should add all these individual factors up and consider it to be a big ball of wax and look at the totality of the circumstances and find that to be shareholder oppression. I believe the trial court properly analyzed that ball of wax based on its components and found that there are discounting factors or there's diminishment of each of the elements of that so that it doesn't add up to oppression, that the sum of its parts is not significant. It's not meaningful. It doesn't raise the level of establishing an arbitrary or heavy-handed course of conduct. In doing so, the court spoke of the testimony of the experts and it's the appellant's contention that the court disregarded what the experts say. In my reading of the court's order, I don't believe the court disregarded what the experts had to say, but I believe the court spoke to just the way the court was going to give those experts testimony. There's a lot of unique factors about the situation in the business at the time of the relevant time frame the business was in a transition in the products it was selling and the way it was selling it. The economy was in a recession, so in light of all the unique factors, I believe it was appropriate for the court to not necessarily give substantial weight to the testimony of any of the experts. By saying the court isn't giving great weight to that doesn't mean the court's disregarding or not substituting its own discretion for that of the experts. His own opinion. I'm sorry. His own opinion. You said discretion. Yes, he's not substituting his own opinion for that of the experts. In speaking of the experts, the other issue that came up with regard to the experts was Neil Gerber's attempt to testify regarding the rental income and he was testifying regarding an appraiser's opinion. I don't believe that the 700 rules, 703, 705, allow for this interdisciplinary reliance. All of the case law that either party has brought forth has spoken to a doctor relying on medical reports prepared by that doctor's office, an accountant relying on a tax return prepared by another accountant. It's always been interdisciplinary, which I believe is meaningful because a doctor possesses the competency to evaluate whether the medical reports he's relying upon appear to be ordinary and reasonable. An accountant lacks the ability to meaningfully measure a real estate appraiser's work and to allow him to bring in that appraiser's opinion without the appraiser coming and testifying himself effectively disarms the opposing party, in this case the defendant, from having its ability to cross-examine the appraiser regarding his opinion to test its mettle on cross-examination. And I don't believe the decision of the trial court created prejudice to the plaintiff because simply the trial court's decision was that Gerber couldn't bring in that report without the appraiser bringing the report in himself. The fact that the appraiser wasn't available to testify speaks only to the plaintiff's arrangements it made and decisions the plaintiff made on disclosing witnesses and having witnesses available for trial. Had the appraiser been available for trial and then properly disclosed, he could have testified and nothing of the court's reasoning or opinion would have precluded that appraiser's confident professional testimony. Counsel has two minutes. So what is the discipline of an accountant? Because this expert is an accountant, correct? He is an accountant. So I would view the discipline of an accountant as viewing business financial records, profit and loss statements, tax returns, matters upon which the accountant is called to learn and study in his course of study and when obtaining a CPA to be evaluated on. So I think one of the parallel cases talked about a tax return. I think that falls directly within the discipline of an accountant. And if we were talking about an accountant testifying as to a tax return prepared by another accountant, I believe the distinction the case law made would find that to be permissible. Where I think the line falls here is that the real estate appraiser is trained in looking at comparable properties, looking at income generated therefrom, evaluating the worth of properties and the stream of income that should be generated therefrom. And that is a part of his licensing with the state, that is a part of his professional training, and that's not a part of the professional training of the CPA. So in summary, Your Honors, I believe the plaintiff made strategic decisions on how the case was presented to the court. I believe the plaintiff chose to present its case under Section A3 of the statute. I believe the cases presented under Section A3 was not sufficiently proven. I believe the trial court's evaluation of each of the individual components of the alleged oppression was appropriate and was consistent with the evidence presented. I don't believe the trial court's decision was against the manifest way of the evidence. The trial court's decision to bar the expert testimony regarding the appraisal was not the use of the court's discretion. I believe the plaintiff essentially seeks redress from some of the strategic decisions made on how to present the case and who to have available to testify. I don't believe that equates to a reversible error for the court. So on behalf of the applicant, I request that the decision trial court be affirmed. Thank you. Thank you, Mr. McGrath. Jackson, Interim Governor. Pardon me? I just stepped in the building. Oh, I'm sorry. Just a couple of points in the time that I have left. First of all, it's significant that they have not denied that Cynthia Springer was removed from the Board of Directors because of the, quote, lawsuit, in quotes. That's the language used by their attorney at the time of the December 2007 board meeting when she was voted off the board. With respect to changing the locks very quickly, the judge didn't find much credibility in the testimony of Stephen Gunther, who testified that, you know, they did it for security reasons, but the court found that the locks had never been changed in the history of the company before that and questioned whether or not that was the real reason for doing it, but then found that he couldn't find anything that said that Cynthia had requested keys to the new locks. Well, it's a small point, but it adds to the litany of other information about what happened to Cynthia during this period of time. She had, in fact, she went to her father, she went to her mother, asking for keys to the new locks on the door, but she was denied each time. Talk about the, in their brief, and I didn't want to miss this point because I didn't want the court to think I didn't think it was important. They mentioned that they thought this ought to be a derivative action instead of an oppression action, but the law says that you can do either one. It's a derivative action if it impacts the corporation, but what we're talking about is what impacted the minority shareholder in this case, and therefore the oppression action was the correct action for us to file in this case. At trial, Don Guthard testified that he did not allow Cynthia Springer to buy an interest in his shares and or participate in the purchase of pet meds in the other stores because of the lawsuit. And again, we're talking about a cause of action under the Americans with Disabilities Act, which is clearly, clearly a violation of the law to penalize the person because he or she has filed a federal lawsuit for that reason. With respect to the expert testimony, unless I'm reading the statute, 703, 703 of the federal rules were adopted by the state of Illinois through Wilson versus Clark back in 1981, and 84 Illinois 2nd, 186. And it says an expert may base his opinion upon the scientific, technical, or other specialized knowledge that makes the witness an expert, including facts, data, and liability authority. Our expert testified that he had done business evaluations for years. That's part of what he does for Hanwood Barnwork, the accounting firm. So he had expertise. He also testifies it's usual and customary for experts of his nature to be able to rely on reports provided by other experts. In this case, we had employed the services of a real estate appraiser to appraise the property to discuss the issue of excessive rent. That was the specific purpose for doing it. And he relied on that or was going to rely on that real estate appraiser before he was shut down by the circuit court. But there was some counsel saying that the real estate appraiser could have been brought in. He could have been. He was in California at the time, and that's why he was not brought in. But frankly, we were of the opinion before the trial, based on Neil Gerber's testimony, that the fact that he had done this in the past relied on other reports of experts to render an opinion in this case. And so under 703, federal rule 703, and now state rule 703, that he could do it in this case as well. And so we were taken aback when he was not allowed to testify to the manner in which he proceeded in doing his expert evaluation. This was not a surprise to the other side because he had revealed to them prior to the court in his expert opinion, as well as his deposition, that he relied on those real estate appraisers in order to come to the conclusion that the two brothers had taken excessive rents in this case. So it wasn't like they were caught by surprise at the trial of this matter. Counsel has one minute. Thank you. Well, I think that's the only point that I want to make anyway. Thank you, Your Honor. Thank you, Mr. Jackson. Thank you both for your argument today. We will take this matter under advisement. We thank you for the written disposition within a short day. We will now take a short recess.